THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.* PETER SICKLEY, Defendant-Appellee.

Third District   No. 82—499

Opinion filed April 21, 1983.

Gary L. Peterlin, State's Attorney, of Ottawa (John X. Breslin and Patricia Hartmann, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Cynthia M. Raccuglia, of Anthony C. Raccuglia & Associates, of Peru, for appellee.

JUSTICE SCOTT delivered the opinion of the court:

The defendant, Peter Sickley, was charged in a three-count indictment with the offense of indecent liberties with a child. Defense motions to suppress a written statement and videotape statements were denied.

At trial, the defendant renewed his motion to suppress the statements and moved *in limine* to exclude the testimony of a polygraph examiner who witnessed the statements of the accused.

The circuit court of La Salle County reversed its prior ruling and granted defendant's motion to suppress the statements, from which the State now appeals.

The facts indicate that the 57-year-old defendant was a guidance counselor at the Tonica High School and Grade School for 18 years. It was alleged that on three separate occasions in December of 1981 the defendant engaged in lewd touching of one of his female students.

Following the alleged incidents but prior to the defendant's indictment, arrangements were made for the defendant to take a polygraph examination. Due to the existence of the allegations and the pendency of the criminal investigation, the defendant had been suspended from his professional duties in the school system.

An initial polygraph examination (which is not the subject of this appeal) was taken by the defendant at the request of the La Salle County Sheriff's Department. The results were apparently either inconclusive or unsatisfactory, and the defendant was afforded the opportunity to take another polygraph examination. This time the lie detector test was administered by William P. Schrieber, a polygraph examinator for John E. Reed & Associates, which had made arrangements with the school board to examine the defendant. The admissibility of statements made by the defendant and a written "letter of apology" obtained from the defendant at the conclusion of his interrogation by Schrieber are the subjects of this appeal. The pretest interview and the confrontation of the defendant following the polygraph examination have been preserved on videotape. The actual lie detector test was not recorded.

The defendant's motion to suppress alleged that the statements of the accused were involuntary and elicited by representations of leniency.

At the hearing Schrieber testified he met with the defendant on February 5, 1982, at the Chicago office of John E. Reed & Associates

pursuant to arrangements with the Tonica school district, and that the appointment and examination were made with the consent of the defendant and his attorney. The defendant's attorney, however, was not present in the examination room with his client and was unaware of the tactics employed by Schrieber. Schrieber described the defendant's demeanor as somewhat nervous but not abnormally distraught. He testified that he obtained some routine background information from the defendant and then conducted a pretest interview in which he went over with the defendant the questions that would be asked. The polygraph examination was then administered to the defendant and following a brief analysis of the results, he informed the defendant that he had failed the test. Then, according to "standard procedure," the defendant was "confronted" and using a "religious mode," the defendant was persuaded to tell the truth and admit to the touching of the student. He denied making any threats or promises to the defendant to induce such statements. Schrieber also testified that he did not mention the school board or the defendant's possible reinstatement to teaching if he cooperated.

The defendant testified that when he appeared for the polygraph examination Mr. Stanley Eisenhammer, the attorney for the school board, was present. The defendant stated that he was upset and depressed because he had been dismissed from his teaching duties and despite his belief that he was innocent, the only way he could clear himself was by taking the test and passing it. The defendant denied that he confessed to touching the child's bare chest or thigh and only wrote the "letter of apology" to Eisenhammer at the insistence of Schrieber. The defendant testified that Schrieber convinced him the letter was necessary if he wanted to get his job back.

Without viewing the videotape the circuit court denied the defendant's motion to suppress. However, the court did view the videotape at a later date but denied the defendant's motion to reconsider. Specifically, the court found the defendant's statements to be voluntary despite the fact that it appeared the defendant believed he was being promised a recommendation that he be retained.

When the trial commenced the People called Daniel Malloy, a witness to defendant's written letter of apology, to testify. The defendant moved *in limine* to exclude his testimony on the grounds that the defendant had given only a limited consent to the disclosure of any statements made to the polygraph examiners and that it would be error to identify the witness as a polygraph examiner or to resort to a fiction as to his identity.

The court granted the defendant's motion for the reason that the

defendant could not, on cross-examination, go into the conversations and events which led to the written statement of apology. Furthermore, the court indicated that after "much soul searching" it was "appalled at the tactics" employed by Schrieber and that they amounted to "psychological brainwashing" which rendered the statements involuntary.

We have reviewed the videotape and believe that it would be impossible to pass upon the issue of the voluntariness of the defendant's statements without viewing this evidence.

The videotape evidence discloses that for approximately one-half hour Schrieber conducted a pretest interview of the defendant as to his background and the allegations made against him. The defendant denied that he touched the child's bare chest or breasts and further denied that he touched her bare thigh. The defendant admitted touching a bump on the child's lip which she told him had been sustained in a fall from a horse. The child had not been doing well in her school work, and the defendant found that this was in part due to her grief over the death of a close relative. In consoling the child the defendant had held her in his arms but denied touching her in any unnatural or lewd manner. The child liked to sit on his knee and the defendant told her it didn't look right and others might not understand since his office door was always open and anybody could see them.

The defendant was asked if he had *ever in his life* engaged in any "unnatural sex," even as far back as when he was a child, and the defendant responded with several personal but totally irrelevant statements regarding his youth. These questions were put to the defendant after Schrieber discovered that the defendant was a devout Catholic who confessed his sins and attended mass and received communion weekly. The defendant repeatedly denied touching the child.

Following the pretest interview the defendant underwent the polygraph examination, which was not taped.

The videotape resumed with the defendant being confronted with Schrieber telling him "our investigation clearly shows you did these things" to the child. The defendant indicated that he didn't understand how this could be since he had not done those things, but again Schrieber repeated there was no use denying the charges since the investigation clearly showed the defendant to be guilty. Schrieber then proceeded on a 20-minute harangue in which he continually accused the defendant of committing the acts against the child. Schrieber repeatedly mentioned the school board, knowing full well that the defendant was suspended from his teaching position. Not only did Schrieber tell the defendant that he could not make a recommenda-

tion to the board unless the defendant appeared apologetic and honest, but he used the example of two people being employed by the board, both of whom were believed by the board to have done something wrong, and who would the board rather work with, the one who appeared apologetic or the one who did not say anything. By not saying anything he would let the people on the school board think he had "intentions of going all the way" and that "he had done this with every girl that had ever come into his office."

When the defendant tried to interpose his innocence, Schrieber interrupted him by telling him to let him finish. The defendant was asked, "Did you call her in with the intention of touching her or did it just happen? Which one was it?" Schrieber would not allow the defendant to maintain his innocence and told him that he "did not even want to hear that he didn't touch her bare chest or bare thigh." That the only way for the defendant to "straighten this thing out" was to admit it and then the board would "work with him." That only a religious person would confess and the defendant had said he was a devout Catholic and he must then confess because God could see into his mind and he would be haunted by this the rest of his life unless he got this straightened out by admitting it. The defendant was told that the school board was going to ask their impression and "what we have to say is very important," and that they wanted to believe him but couldn't unless he would admit to it.

Finally the defendant admitted that he must have gotten "carried away" although he didn't remember doing any of the things the child claimed, but Schrieber said the child had no reason to lie so the best thing would be to write a "letter of apology" to the school board, which the defendant agreed to do. Schrieber dictated the statement and the defendant wrote down verbatim what he was told. Prior to writing the "apology" the defendant asked Schrieber for advice as to whether he should first talk to his attorney, who was in the other room, and Schrieber explained that he couldn't really advise him, but if the attorney had arranged for the test he must have meant for him to cooperate fully and that included writing the letter, and that the attorney would want it done "now."

The primary question to be answered by the circuit court was whether, under the totality of the circumstances, the defendant's statements were involuntary. *People v. Noe* (1980), 86 Ill. App. 3d 762, 408 N.E.2d 483.

In determining whether a statement is voluntary, it must be ascertained whether the defendant's will was overcome at the time he confessed or whether the admission was made freely, without compulsion

of any sort. (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601.) The State has the burden of showing that a statement was made without compulsion of any sort. This does not mean that only statements induced by physical coercion or promises of leniency or immunity are involuntary. Consideration is to be given to the details of the interrogation and the characteristics of the accused. *People v. Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870.

The trial court's decision on the issue of voluntariness is not to be disturbed unless it is contrary to the manifest weight of the evidence. *People v. Woodburn* (1979), 75 Ill. App. 3d 532, 393 N.E.2d 1332.

Our review of the videotape evidence leads us to conclude that the decision of the circuit court that the statements of the defendant and the "letter of apology" were induced through misrepresentation, duress, improper influence and psychological brainwashing was correct. The defendant had two choices. First, keep silent and let the school board believe he had committed the acts that he was accused of, or apologize for something that did not appear so bad, that he had done nothing more "than other board members may have done under the circumstances," that he had just gotten "carried away" but that he had "stopped himself" and once he admitted it, things would be "worked out" when they (polygraph examiners) met with the board to give their report and recommendations. The only thing the defendant could do to satisfy Schrieber, to earn his recommendation, was to retract his repeated claims of innocence and admit "he was human" and the board "being human" would understand. Attorney Eisenhammer's presence at the offices of the polygraph examiner immediately prior to the test and the dictated letter of apology to him following the "confrontation" could only reconfirm, in the defendant's mind that Schrieber had the power and the authority and was prepared to use it for or against him depending upon his cooperation. The defendant was repeatedly told, "Remember, our main concern is you, Pete."

The State argues that despite the fact that our supreme court has held that polygraph results are not admissible (*People v. Baynes* (1981), 88 Ill. 2d 225, 430 N.E.2d 1070), this does not preclude the introduction into evidence of statements obtained after a polygraph examination is administered. We agree. However, the inquiry into the issue of voluntariness cannot be conducted in a vacuum. Here, the alleged failure of the defendant to pass the polygraph examination was an event, if not *the* event, used by the examiner to confront the defendant and to coerce his cooperation. The defendant was in effect told that to take issue with such evidence, "our investigation," would be useless and if he wanted to save his job and his career at 57 years

of age, his only chance was to admit his wrong and that the board would understand because he (Schrieber) would report to the board and what he had to say was important.

The State also contends that no direct promises of leniency were made to the defendant and that any impression the defendant had was purely subjective. It is further alleged that under the rule of *People v. Heide* (1922), 302 Ill. 624, 135 N.E. 77, a confession only becomes incompetent when any degree of influence has been exerted by any person having authority over the charge against the defendant to cause duress or hope of leniency. The State argues that since Schrieber had no authority to institute or dismiss criminal charges against the defendant, he lacked the requisite authority as provided in *Heide*.

While it is true that Schrieber may have had no actual power to initiate or terminate criminal proceedings against the defendant, that does not appear to be the issue. The important question is whether he represented to the defendant that he had real or apparent authority to alter or influence a certain course of events in the event the defendant capitulated and whether the defendant reasonably believed that changing his statement was necessary to obtain certain preferential treatment. *People v. Ruegger* (1975), 32 Ill. App. 3d 765, 336 N.E.2d 50 (police officers' offer to "go to bat" for the defendant on matters relating to a recognizance bond and probation if defendant held sufficient to render subsequent statements of defendant involuntary); see also *People v. Hogan* (1982), 31 Cal. 3d 815, 647 P.2d 93, 183 Cal. Rptr. 817 (psychological coercion).

The videotape is graphic evidence of the deterioration of the defendant's will to resist under the pressure to save his career by the only means made available, *i.e.*, a confession in return for a favorable recommendation by Schrieber to the school board. The totality of the circumstances surrounding defendant's statements and letter of apology raises a strong doubt as to their volitional character. *People v. Hogan* (1982), 31 Cal. 3d 815, 843, 647 P.2d 93, 109, 183 Cal. Rptr. 817, 833.

For the foregoing reasons, the judgment of the circuit court of La Salle County is affirmed.

Affirmed.

STOUDER, P.J., and ALLOY, J., concur.