THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PHIL MARSHALL, Defendant-Appellant.

Second District   No. 2—87—1076

Opinion filed January 18, 1990.—Rehearing denied February 21, 1990.

G. Joseph Weller and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Colleen M. Griffin, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE UNVERZAGT delivered the opinion of the court:

Defendant, Phil Marshall, was found guilty of five counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(b)(1)) and one count of aggravated criminal sexual abuse (Ill. Rev. Stat. 1985, ch. 38, par. 12—16(d)) following a bench trial in the circuit

court of Du Page County. He was sentenced to five 15-year terms of imprisonment for the aggravated criminal sexual assaults and a five-year term of imprisonment for the aggravated criminal sexual abuse, all of which were ordered to be served concurrently. Defendant appeals from these convictions.

Defendant raises one issue, contending that "where the defendant was arrested in a hotel room in front of two operational video cameras, the decision of the police to stop the recording at the commencement of the arrest, together with the prosecutor's failure to offer testimony from all of the police officers present inside the room at the arrest and the defendant's later assertions of physical and mental abuse, rendered the lower court's finding of compliance with the 'material witness' rule against the manifest weight of the evidence." We find insufficient merit in his argument to warrant reversal and a remand.

It is unnecessary, in view of the issue raised, to discuss at length the evidence adduced at trial. The offenses of which defendant was convicted involved a 12-year-old male complainant. Two of the offenses, on October 8 and 29, 1986, were acts of fellatio involving defendant and the complainant during which defendant threatened the complainant with a gun. The remaining four offenses, on October 11, 17, 21, and 23, 1986, were acts of fellatio involving defendant and the complainant during which no weapon was used. The evidence of these offenses came primarily from the testimony of the complainant and statements made by defendant to police officers, with some supplementation by corroborative testimony from other witnesses.

The evidence surrounding defendant's arrest and interrogation, which was adduced at a pretrial suppression hearing, is of more importance with respect to the issue raised. There is little dispute regarding the events preceding defendant's arrest, which the police videotaped.

Defendant was directed to a room, which was part of a suite, in the Oak Brook Marriott Hotel the evening of November 19, 1986, on the pretense that he and the complainant, who accompanied him, were to make a pornographic film. Undercover officer James Turner introduced defendant to Officer Robert Thomas, who played the part of the producer of the film. Special agent Arthur Sebek acted as the cameraman for the film. To make their story more believable, the police had set up a video camera and a video recorder loaded with tape, which were ready to record but were never turned on. Unknown to defendant, in an adjoining room of the suite, there was another loaded video recorder and a video camera trained on defendant and

Thomas through a one-way mirror.

After defendant and the complainant arrived, Thomas spoke to defendant, and the hidden camera recorded the conversation. Defendant described sexual acts he and the complainant had performed and the sexual acts they planned to perform for the film. Turner took the complainant into the hallway. Defendant stripped to his underpants and lay facedown on a bed out of range of the hidden camera preparatory to the start of filming. After defendant was so positioned, at least six officers including at least one with a drawn gun rushed him and placed defendant under arrest. Right after the police rushed defendant, the hidden camera was turned off, and with respect to what occurred after the camera was turned off, the testimony of the witnesses was divergent.

At the suppression hearing, defendant testified in his own behalf; and in addition to Thomas, Turner and Sebek, Lieutenant Daniel McDevitt, Supervisor John Meduga, Officer Ralph Billingslea, and acting Elmhurst police chief John Milner testified for the State. Defendant testified that, when he was lying facedown on the bed dressed only in his undershorts, someone suddenly put hands on his shoulder, pulled him over, and stuck a gun in his face. McDevitt then came over and stuck a gun in defendant's face and said, "If you move, [obscenity], I'll blow your head off." None of the State's witnesses recalled any officer making this statement, although they did testify that defendant was told not to move and that McDevitt told defendant to put his "[obscenity] hands" on his head.

Defendant testified that there were several police officers pointing guns at him when he was turned over. The State's witnesses testified only to McDevitt's gun being drawn, and that gun was reholstered after defendant was handcuffed. Moreover, according to the State's witnesses, McDevitt had announced his office before turning defendant over, while defendant did not recall hearing anyone identify them as police.

Defendant testified he was handcuffed in the back so tightly he had scars that took six months to heal and he was so frightened that he did not complain at the time, but he later received some ointment for them from a nurse at the jail. The State's witnesses denied that defendant was handcuffed any more tightly than usual.

According to defendant, he was pulled up to a standing position by his arms, which were handcuffed behind him. The police took pictures of him, laughed at him, and made insulting statements, calling him a "geek," "faggot," and "cutie pie." Someone said to shoot him if he moved. There were 15 to 20 people in the room, including a

woman defendant recognized as a Bensenville police officer. The State's witnesses denied the police taking pictures of defendant, or verbally abusing him. They also testified that many fewer people, around six, were in the room, and none recalled a woman police officer being present.

Defendant testified that the police eventually uncuffed him and allowed him to dress, after which he was recuffed in front and seated at a table. Thomas pulled out a form (which was a waiver of *Miranda* rights form) and told defendant they wanted him to sign it. Defendant refused. Thomas gave defendant a pen, pressed his finger into defendant's collar bone, and told defendant they wanted him to sign the form. Defendant complied without reading it. Turner's and Bellingslea's signatures as witnesses were already on the form when defendant signed. According to the State's witnesses, *Miranda* warnings were properly given, the police did not in way any compel defendant to sign the waiver, and Turner's and Bellingslea's signatures as witnesses were not placed on the form until after defendant signed it.

Defendant testified that Thomas asked him about dealers and manufacturers of pornography. Defendant denied involvement in pornography, and Thomas called him a liar and offered to "cut a deal." According to the State's witnesses, the police only asked defendant for personal background information at the hotel and did not substantively question him until later at the police station.

According to defendant, a black man found a wallet in defendant's gym bag, saw a photograph of defendant's son, and accused defendant of playing with little boys. They found defendant's keys, had defendant select the one for his car, and the man ran out the door with the keys. Billingslea, testifying for the State, denied going through defendant's wallet, taking defendant's keys, or seeing anyone else do so.

Defendant testified that the police took about 10 Polaroid photographs of defendant against a wall in the hotel room. At one point, a man in a white shirt came up to him, struck him in the chest, and said, "If you'd have done this to my kid, I'd have killed you." Defendant later learned his rib was injured. The State's witnesses denied seeing any of the police take any Polaroid photographs of defendant in the hotel room. Thomas specifically testified that he was with defendant for the entire period in the hotel room after his arrest and never heard any officer tell defendant, "If you would have done this to my son, I'd have killed you."

Defendant and the State's witnesses also disagreed with respect

to occurrences while defendant was being transported to the police station and during his interrogation at the police station.

At the station, after he was further questioned, defendant made the statements he later challenged as involuntary. Also, defendant testified, without contradiction, that he told a nurse at Du Page County jail that his wrists and chest hurt when he arrived at the jail at 1:22 a.m. A doctor at the jail examined his rib. He was later taken to Central Du Page Hospital, where his chest was examined. No X rays were taken, and the medical records from the jail which were admitted at the hearing did not mention any trauma to the ribs but did note a heart condition called mitral stenosis.

The basic thrust of defendant's argument is that the trial court erred in denying his motion to suppress because the State failed to produce, or explain the absence of, all material witnesses to defendant's confession. We disagree.

■■■ The law governing the burden of proof at a motion to suppress a confession on the ground that it was involuntary is well settled.

"In determining whether a statement is involuntary, it must be ascertained whether the defendant's will was overcome at the time he confessed or whether the admission was made freely, without compulsion of any sort. (*People v. Prim* (1972), 53 Ill. 2d 62, 289 N.E.2d 601.) The State has the burden of showing that a statement was made without compulsion of any sort. This does not mean that only statements induced by physical coercion or promises of leniency or immunity are involuntary. Consideration is to be given to the details of the interrogation and the characteristics of the accused." (*People v. Sickley* (1983), 114 Ill. App. 3d 167, 171-72.)

Only by producing all material witnesses to a confession, or satisfactorily explaining their absence, can the State discharge its burden of proving the confession voluntary. (*E.g., People v. Armstrong* (1972), 51 Ill. 2d 471, 475-76; *People v. Wright* (1962), 24 Ill. 2d 88, 92-93.) If the State fails to produce all of the available material witnesses, the trial court must exclude the confession. *People v. Sammons* (1959), 17 Ill. 2d 316, 319.

As our supreme court stated in *People v. Sims*:

"[T]he persons who must be called as witnesses or whose absence must be explained are those persons whose testimony would be material on the issue of the voluntary nature of the confession." *People v. Sims* (1961), 21 Ill. 2d 425, 432.

Defendant contends:

"[A] number of police witnesses were not called by the prosecution: two of the audio-video technicians, including the supervisor, as well as the other officers depicted on the videotape itself."

The State does not dispute their absence or claim that their absence was adequately explained; rather, the State contends that these persons were not material witnesses.

Defendant claimed that, beginning immediately after his arrest, several guns were pointed at him; he was threatened with death on multiple occasions, including once at gunpoint at the time he was arrested; he was verbally and physically abused; and he was photographed on several occasions, all while in the hotel room. Anybody who witnessed any of these occurrences, or was in a position to witness them if they in fact occurred, is a material witness with respect to the voluntariness of the later confession.

With regard to the video technicians, the State argues:

"The video technicians were in a hotel room adjoining that in which the defendant was arrested. *** As stated in defendant's brief, the video equipment was turned off at the moment of arrest. Since the video equipment was turned off when the alleged violations of defendant's rights occurred, there is nothing to indicate that these video technicians were witnesses to anything. The fact that the video technicians may have been in and out of the room when removing the video equipment does not make them material witnesses. *** The video technicians in this case had no occasion to witness anything which might have been material on the voluntary nature of the defendant's confession."

The State also argues that these police officers were not material witnesses because "there is absolutely no indication that any statements were made in the presence of these officers."

The State argues:

"As far as defendant's contentions that guns were thrust in his face, that death threats were made, and that his handcuffs were tight, there is nothing to indicate that the officers allegedly present during this time would have testified differently from officer McDermitt [sic], who was present during these alleged occurrences. Both Officer McDermitt [sic] and the defendant presented evidence as to what occurred at the time of defendant's arrest. Thus, the absence of these other officers' testimony did not impede the trial court's determination of voluntariness."

■ We reject the defendant's contentions since all of the material witnesses on the issue of whether the statements made to the police after his arrest were the result of physical and mental intimidation were present and testified on the motion to suppress these statements. In the case at hand, the State did produce all of those police officers who were present during the alleged misconduct related to the voluntariness of the statement he signed. The only witnesses the State must call are those whose testimony would be material on the issue of the voluntary nature of the confession. *People v. Armstrong* (1972), 51 Ill. 2d 471, 475.

■ The recent case of *People v. Gaytan* (1989), 186 Ill. App. 3d 919, 928, provides that, where a defendant fails to claim that his confession was the product of coercion or was involuntary, it is unnecessary for the State to produce all of the witnesses to the confession. This court in *Gaytan* points out that, where the defendant claims that the police used excessive force in arresting him but failed to establish, either in his motion to suppress or in his testimony at the suppression hearing, any relationship between the alleged use of force and his subsequent confession such that the use of force resulted in a coerced or involuntary confession, the State need not produce all the witnesses present during the alleged misconduct.

In his motion to suppress, the defendant alleged he was arrested at gunpoint; two policemen pointed guns at his face and a third uttered an obscenity at him. He was pulled out of bed and handcuffed in such a manner that it cut off circulation to his hands. He was ordered to stand, was photographed in his underwear and told that if he moved, he would be shot. He was allowed to dress, after which, he alleges, an officer said to him, "If you'd have done this to my son, I'd have killed you." He alleges the officer struck him in the chest area.

Thereafter, his motion indicates, he was transported to the police station. On the way there, he alleges, the police parked by the side of the road, causing a 10-minute delay which put him in fear for his safety.

When at the police station, he alleges he was not allowed to see an attorney, the officers insisted he give a statement, and they ridiculed and directed vulgar epithets at him.

■ In reviewing the defendant's testimony at the motion to suppress, we are unable to discern any testimony by him which would show that the alleged use of force resulted in his being coerced into an involuntary confession. We note the defendant's brief does not direct our attention to any record reference in this regard.

Therefore, it was not error for the State to have failed to present

the testimony of the other officers present at the Marriott Hotel at the time of the defendant's arrest.

For these reasons, the judgment and sentence of the circuit court of Du Page County are affirmed.

Affirmed.

INGLIS and REINHARD, JJ., concur.